quired in considering such evidence was that it be carefully scrutinized, and that, after that had been done, and the jury was convinced they were telling the truth, they must give the evidence its full effect. The attention of the jury was also directed to the interest of the defendant in denying the adultery, and the probability of the corespondent denying it, even if it was true. The instruction to the jury was as favorable as the plaintiff could ask. The verdict cannot be said to have been influenced by passion, or prejudice, or disregard of testimony. There was a clear issue of fact presented for consideration. The jury determined it. It makes no difference what the trial court might have done had it decided the question. The issue being clearly defined, and being one for the jury, the verdict carries the question beyond the province of the trial court. It cannot be said that there is such overwhelming proof in favor of the plaintiff that the verdict should be set aside. The law criticises his witnesses. The evidence of the detectives was the best he could furnish, but that did not relieve his witnesses from the criticism which the law imposes. An order must be entered denying the motion.

Motion denied.

---

## JONES v. MAYOR, ETC., OF CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. April 4, 1901.)

1. MUNICIPAL CORPORATIONS—SEWER—CONSTRUCTION—RAILWAY TRACKS—REMOVAL—LIABILITY OF CITY.

Plaintiff agreed that he would furnish the necessary facilities to preserve a railroad track on the line of a sewer from injury, either by removal or otherwise, without extra charge; and the park commissioners agreed that, in case it should be necessary to remove the tracks, they would notify the company to do so. Work was commenced on the sewer September 29, 1884, and, removal not being necessary, the city engineer notified the company to protect its tracks. The piles at the bottom of the trench for the support of the sewer were driven beneath the tracks by the railroad company at intervals between trains, and it left its machinery on a side track, in plaintiff's way. *Held*, that the city was not liable for an alleged negligent and dilatory performance of its duty in securing the removal and shoring up of the railway tracks, since the only duty imposed on the city was to notify the company in case removal was necessary, and any delay occasioned by the company could not be charged to the city.

2. SAME—SPECIFICATION—DEFECTS—DELAY—DAMAGES.

Plaintiff agreed that, in case the bottom of the trench for a sewer should be decided to be too soft at any point to warrant building the sewer on any of the prescribed foundations, the park commissioners should have the right to put down a pile foundation, by contract or otherwise. The work was commenced on September 29, 1884; and on October 17th the city engineer reported that piles would be necessary at certain points, and on October 27th the board of aldermen passed a resolution authorizing the park commissioners to contract for piles, and the resolution was signed by the mayor on October 30th. *Held*, that the contention that plaintiff was entitled to damages for delay occasioned because the passage of an ordinance was necessary to remedy defects in the specifications could not be sustained, since both parties contemplated that a pile foundation might be necessary, and the specifications provided for such an emergency, and hence were not defective, and plaintiff, by assenting to them, waived any claim for the alleged delay.

**3. SAME—SPECIFICATIONS—MODIFICATION—LIABILITY.**

Plaintiff agreed to complete a sewer in strict conformity with the specifications, and that no diversion should be made unless written permission was obtained from the park commissioners. The plans required the invert and side walls of the sewer to be built on a concrete foundation, and plaintiff, without authority from the park commissioners, began substituting rubblestone for the concrete. On April 19, 1886, the city engineer notified plaintiff to complete the sewer according to the plans, and on May 17th further notified him that, if any portion was built contrary to the plans after the notice of April 19th, the work must be taken up and rebuilt. Between April 19th and June 4th plaintiff built but 38½ feet of masonry on concrete foundation, and refused to continue. On May 29th the park commissioners adopted a resolution to allow plaintiff to lay a rubble foundation, which the corporation counsel refused to approve. Plaintiff was notified of the refusal, and ordered to proceed with the concrete foundation without delay, but he did not resume work until October 16th. *Held*, that the contention that plaintiff was entitled to damages on the ground that the specifications, as drawn, were impracticable, and that he was delayed by the necessity of securing a substitution of a rubble for a concrete foundation, could not be sustained, since there was no evidence that the specifications were impracticable, and the delay was occasioned by plaintiff's refusal to execute the original contract when ordered to do so.

**4. SAME—WORK—CONSTRUCTION—ENGINEER'S PERMISSION.**

Plaintiff agreed that the city engineer's decision that piles were necessary for the foundation of a sewer to be built by plaintiff should be final. On June 28, 1887, plaintiff notified the board that piles were necessary at certain places, and requested a speedy reply. The engineer answered on June 30th, notifying plaintiff to construct the sewer at such points without piles, and on November 19th further notified plaintiff to proceed without driving piles, and that the engineer had examined the trench and found that piles were not necessary. On December 25th certain property owners presented an opinion of an expert engineer that piles were necessary at such points. Plaintiff refused to continue the work, and finally the park commissioners yielded to the demand of the property owners and authorized the use of piles. *Held*, that plaintiff was not entitled to damages for a delay alleged to have been occasioned by the refusal of the engineer to give his permission to drive piles, since the engineer's decision that piles were not necessary was final, and plaintiff had refused to abide by it.

**5. SAME—CONTRACT PRICE—REDUCTION—DETERMINATION.**

A contract for a sewer provided that it should be completed within 500 working days, and authorized the board of park commissioners to deduct out of any moneys which might become due to plaintiff, as liquidated damages for noncompletion within the time limited, the sum which shall accrue for the inspectors' wages for each and every day the inspectors were employed after the time stipulated for completion of the work. *Held*, that the board of park commissioners were entitled to determine the amount of overtime the inspectors were employed.

**6. SAME—PAYMENTS—ACCEPTANCE—ESTOPPEL.**

Where, by the terms of a contract to construct a sewer, the board of park commissioners were entitled to deduct the wages of inspectors after the time specified for completing the contract, by the acceptance by plaintiff of payments on his contract without disputing his liability for certain reductions made by the city engineer for excess in inspection, and without contesting the accuracy of such reductions, he was precluded from subsequently contending that the reductions were improperly made.

**7. SAME—REDUCTIONS—ACCURACY—BURDEN OF PROOF.**

Where a contract for the construction of a sewer provided that the board of park commissioners might deduct the wages of inspectors of the work after the time limited for completion of the contract from any amount due plaintiff, and plaintiff executed a release for a payment, but reserved

the right to object to a reduction because of excess of inspection, the burden of proving that the reduction was proper was on the defendants, and ·hence, in the absence of proof that the reduction was proper, it cannot be allowed.

Appeal from judgment on report of referee.

Action by Charles Jones against the mayor, aldermen, and commonalty of the city of New York. From a judgment in favor of plaintiff for a part of his claim, he appeals. Affirmed.

The following is the opinion of the referee:

On June 27, 1884, the plaintiff entered into a contract with the defendants for the construction of a sewer in Webster avenue, extending from Brooke avenue, at 165th street, to the northern side of 184th .street. The work was to be commenced on such day and at such place or places as the commissioners of the department of public parks, by their engineer, might designate, and was to be completed on or before the expiration of five hundred days next thereafter; Sundays, holidays, and "days on which the prosecution of the whole of the said work in accordance with the provisions of this agreement is suspended, to be excepted." The sewer was not completed and accepted until February, 1890. In his complaint, the plaintiff alleges five separate causes of action, as follows: For moneys due to him for work done under the contract and wrongfully withheld by the defendants; for damages sustained by the plaintiff by reason of the defendants' neglect or failure to procure the removal of certain railroad tracks which obstructed the plaintiff and prevented him from prosecuting the work; for damages resulting to the plaintiff from delays caused by the imperfection of the plans and specifications for said work prepared by the defendants, and the impossibility of building portions of said sewer in accordance with such plans and specifications; for further damages resulting to the plaintiff from the like cause; for damages resulting to the plaintiff from the defendants' refusal to permit him to put down piles where necessary, and their negligence and delay in determining where piling should be used.

It is admitted that the work done by the plaintiff under the contract amounted, at contract prices, to $224,141.50. It is also admitted that the defendants have paid the plaintiff only the sum of $219,328.50. A claim to recover the balance of $4,813 constitutes the plaintiff's first alleged cause of action. The original contract provided that the work should be simultaneously commenced and carried on without interruption on four different sections, and that on each section an inspector or inspectors might be placed to supervise the same, who should each be paid at the rate of four dollars per day, and that "the aggregate time of all the inspectors so employed will be the time with which the time stipulated for the completion of the work under this agreement will be compared." By another provision the defendants were authorized, out of any moneys that might become due to the plaintiff, to deduct and retain, as liquidated damages for the noncompletion of the work within the time limited, "the sum which shall accrue and become due for the inspectors' wages for each and every day the aggregate time of all the inspectors employed upon said work may exceed the time stipulated for its completion." As each of the four sections of the sewer was finished and accepted by the defendants. a statement of account was rendered to the plaintiff, which was certified as correct by the engineer of construction, and which was also certified by the park commissioners, and which purported to show the work done by the plaintiff upon the section to which it related. and the value of such work at the contract prices, and the amount paid on account by the defendants, and the amount retained as security for repairs, and the amount charged to the plaintiff for "excess of inspection," or inspectors' wages, and the balance remaining due to the plaintiff for such work. The charge for inspectors' wages on section 1 was $744; on section 2, $2,214; on section 3, $781; and on section 4, $1,074. These charges represent 1,203¼ days' overtime, at $4 per day, and make up the plaintiff's first alleged cause of action for $4,813.

As above remarked, the plaintiff's contract was to be completed within five hundred days, certain days excepted, from the day that the park commission-

ers might designate for its commencement. The day designated by the park commissioners was September 29, 1884. Section 1 was not completed and accepted until August, 1887; section 2, not until December, 1887; section 3, not until February, 1889; and section 4, not until February, 1890. The real controversy between the parties is, who is responsible for this long delay? The claim of the defendants is that it is wholly chargeable to the plaintiff, while the plaintiff asserts that his failure to perform within the contract time was owing to the wrongful acts and defaults of the defendants, by which he was obstructed and impeded in the prosecution of the work, and subjected to great additional expense and heavy losses. The delays complained of by the plaintiff and caused, as he alleges, by the defendants, will be first considered.

The sewer was to be built through Webster avenue, northerly "from the end of the existing sewer in Brooke avenue, at 165th street." On September 24, 1884, the defendants' engineer of construction notified the plaintiff to commence work on September 29th, and the plaintiff did so at the point of connection with the Brooke avenue sewer. This was about eighty feet or so easterly from an embankment along which ran the tracks of the New York & Harlem Railroad. The sewer was to be carried under the tracks and through this embankment. The contract contained the following provisions: "In the progress of the work the contractor will be required to afford the necessary facilities to the company or companies owning rail tracks on the line of the work, or to their agents, in the preservation of the same from injury, either by removal or otherwise, without extra charge therefor. In case it be necessary to remove the said tracks, or any portion of them, the said company or companies will be notified by the commissioners of the department of public parks to remove the same within a specified time; and the contractor shall not interfere with the said tracks, or any portion thereof, until the expiration of the time specified in said notice." On the 1st of July, 1884, four days after the execution of the contract, the plaintiff wrote to the president of the park commissioners, calling his attention to these provisions, and adding: "As it will be necessary to either remove or protect the tracks of the New York and Harlem Railroad and the New Haven Railroad, I respectfully ask that the department take such action as may be necessary in the premises." No action was taken by the commissioners in compliance with this request. They were not bound to act, as they had not yet determined when the construction of the sewer should commence. On the 2d of September the plaintiff wrote the commissioners as follows: " * * * I have received no instructions to proceed, nor can I see any indication of the tracks being protected. * * * I respectfully beg leave to call your attention to the matter for the tracks to be protected, and I notified the engineer when to commence work." Just when notice was given to the railroad companies, or what form of notice was given, does not appear. The testimony of Collins, the plaintiff's foreman, is that the work was delayed from September 29th (the day it was commenced) to October 10th, a period of eleven days, awaiting the removal of the tracks. Guion, the assistant engineer, called by the plaintiff, says that the work was not stopped during the time the plaintiff was waiting for the railroad company to protect the tracks; that the plaintiff "kept excavating." Collins also testifies that the work was further delayed from December 18, 1884, to March 25, 1885, a period of eighty-four days, partly because the line of the sewer west of the tracks was occupied and obstructed by the "plant" of the railroad company. This requires a few words of explanation. After the tracks were shored up, a trench for the sewer was excavated through the embankment by the plaintiff. The soil at the bottom of the trench was found to be soft and sandy, and it was decided that a pile foundation was necessary at that point. The piles in the trench were driven by the railroad company. It brought machines upon the ground for the purpose of doing the work, and, as I understand the testimony of Collins, after the company had finished the work, or while it was engaged in it, it placed its machines in Webster avenue, west of the track, thereby interfering with the plaintiff and preventing him from going ahead with the work of construction. The claim of the plaintiff is that it was the duty of the defendants, under the contract, to "procure the removal" of the tracks, "in order to permit the work of the plaintiff to proceed thereunder without delay and injury"; and in his complaint he charges that this

duty was "so negligently, improperly, and dilatorily performed" that the plaintiff was hindered, etc., to his great damage. I cannot agree with the learned counsel in his construction of the contract. Both parties understood that the railroad embankment lay in the way of the contemplated work, and that the construction of the sewer through the embankment would involve a greater or less disturbance of the tracks. The contract was made with special reference to that fact. So far as possible, the operation of the railroad was not to be interfered with. The contractor was required "to afford the necessary facilities" to the railroad company "in the preservation of the tracks from injury, either by removal or otherwise"; and this, too, "without extra charge therefor." All the defendants engaged to do was, in case a removal of the tracks became necessary, to notify the company "to remove them within a specified time." Removal did not become necessary, but, as soon as the work of building the sewer was commenced, the company was notified by the chief engineer to protect its tracks, which it did without any considerable delay. Mr. Guion, the assistant engineer, testifies that, after the notice was given, a month elapsed before anything at all was done. This is a clear mistake. Collins admits that the work of shoring up the tracks was completed by October 10th, and this is accepted as true by counsel in his computation of his claim for damages. The park commissioners having determined that piling was necessary in the trench opened by the plaintiff east of the railroad embankment, application was made to the board of aldermen for authority to enter into a contract with the plaintiff, without public letting, to put in a pile foundation. The necessary resolution was adopted by the aldermen on October 27th, and approved by the mayor on October 30th. On November 7th the plaintiff submitted to the commissioners a proposal to furnish and drive, "where required," piles of the dimensions and quality called for by the plans and specifications attached to the contract of June 27th, for a specified price per lineal foot. This proposal was accepted by the commissioners on the same day, and on November 20th the piling contract (plaintiff's Exhibit 2) was made. Piles were "required" in the trench under the tracks, as well as in the trench east of the embankment, and by his contract the plaintiff had engaged to furnish and drive them. But he drove no piles under the tracks. That work was done by the railroad company, presumably with his consent, for there is no proof that he made objection. And it was leisurely done,— that is, at intervals,—and so as to interrupt as little as possible the trains and traffic on the railroad. Collins testifies that from September 29th to October 10th they "worked up to the railroad track from the point of beginning"; that about October 10th some question arose, and they "didn't resume work until the 21st of November," the day after the piling contract was made; and that between November 21st and December 18th they were driving piles east of the railroad tracks. Engineer Guion says the driving commenced on November 19th. Collins further testifies: "Q. Then what did you do after the 18th of December, 1884? A. Pending that time we were caused delay, awaiting that protection; that is, the driving of the piles, following that until March, when the pile drivers of the railroad—the machines that lay in the way—were removed. Q. Then this delay occurred, which you claim for here, during this period from December 18, 1884, to March 25, 1885, while the railroad company was driving piles under its tracks in the way of the sewer? A. Yes; and the machines in the way of the work by Mr. Jones." I can find no provision in the contract that made it the duty of the defendants to cause the railroad tracks to be removed or shored up so that they should not obstruct or delay the plaintiff in his prosecution of the work; and I can discover no ground upon which the defendants can be charged with the loss occasioned to the plaintiff by the acts of the railroad company in delaying the driving of piles under its tracks, and occupying the avenue west of the tracks with its machinery, to the practical exclusion of the plaintiff. The plaintiff's second alleged cause of action must therefore be dismissed.

The plaintiff's third alleged cause of action, as described in the brief, is for damages resulting from "delays occasioned in waiting for the making of a contract for piling"; the delay covering the period between October 10th and November 21, 1884. As already stated, the bottom of the trench east of the railroad tracks was found to be of a character that required a pile

foundation for the sewer. The testimony of Collins is that, immediately the trench was opened, Assistant Engineer Guion, "took observation, and such tests as he saw fit." Guion says that he commenced to make soundings on October 16th. On October 17th other soundings were made in the presence of the chief engineer, who, Guion says, "then went to the office to report the necessity of putting down pile foundations. He told me to make no further excavation,—no deeper; to stop. I could proceed with the excavation on ahead for additional trench, but not to do anything more there." The report of the chief engineer seems to have been accepted as conclusive by the commissioners, and they seem to have acted with commendable promptness; for on October 27th the resolution above referred to was passed by the board of aldermen, and on October 30th it became of force by the approval of the mayor. This resolution authorized the defendants to enter into a piling contract with the plaintiff, and with no other person. The plaintiff, as a party interested, doubtless had knowledge of the application to the board of aldermen and of its progress. It is alleged in the answer that the resolution was adopted "at the instance and request of the plaintiff," but of this there is no proof. His proposition to make the contract which the resolution authorized was not submitted to the park commissioners until November 7th, and was by them at once accepted, but a fortnight elapsed before the contract was put in form and executed. These proofs forbid a finding that the plaintiff was hindered by any unreasonable or unnecessary delay on the part of the commissioners in making provision for the condition of things discovered by the opening of the trench east of the railroad. Nor does the plaintiff, in the statement of his cause of action, charge them with any such delay. His allegations are that after the work was commenced it was ascertained by the defendants that certain portions of the sewer could not be built "in accordance with the specifications and plans made therefor," and that "by reason of this fault and defect in said plans and specifications, and the impossibility of the performance of the work under the same," the defendants were compelled to procure the passage of an ordinance by the board of aldermen "to remedy the said defect," and that "by reason of the said fault and neglect of the defendants, and the imperfections of the said plans and specifications, and the necessity of making a new contract," the plaintiff was delayed and suffered damage. The learned counsel for the plaintiff argues that "the entire testimony shows that the construction of the work upon pile foundation was not contemplated," and insists that while authority for the making of a new contract was being obtained, and while the new contract was in course of preparation, the plaintiff was prevented by the act of the city from performing his work under the contract of June 27th. He is not exactly right in either of these positions. The contract plainly shows that both parties understood that a pile foundation might become necessary in the course of construction of the sewer. Here are some of its provisions: "It is further agreed that should postponement or delay be occasioned by the precedence of other contracts, including any that may subsequently be made for pile driving on the line of the work, no claim for damages therefor shall be made or allowed, * * * except that, if the contractor shall be delayed in the performance of his work * * * on account of delay in the completion of pile driving, a reasonable allowance of time shall be made him by the commissioners of the department of public parks. When the trench at any point is excavated to its full depth, should the bottom be decided by the engineer to be too soft to warrant the building of the sewer on any of the prescribed foundations, the said commissioners of the department of public parks shall have the right to put down a pile foundation, by contract or otherwise; and the contractor shall not have any claim for damages or otherwise, except a reasonable extension of time, which shall be fixed by the said commissioners, and their decision in the matter shall be final. The contractor shall do all necessary work to put the trench in proper condition for driving piles therein, and leave it thoroughly and tightly sheeted and shored, without extra charge beyond the price paid for the different items of work affected thereby." These provisions, it seems to me, are a complete answer to the plaintiff's third alleged cause of action. The plans and specifications were not faulty or defective in the sense suggested

by the allegation of the complaint. They did not provide that the sewer should be built in whole or in part upon a pile foundation, nor that, in case a pile foundation should be found to be necessary at any point, it should be put down by the plaintiff for a stipulated compensation. But they did take into consideration and provide against the possible necessity of a pile foundation, and a possible delay and damage to the plaintiff on account thereof, and they reserved to the defendants the right to do that work "by contract or otherwise"; and they provided that pile-driving contracts should or might have a precedence or right of way; and that the plaintiff should have no claim "for damages or otherwise" in case the defendants, by putting down a pile foundation, should interrupt or impede the plaintiff in the performance of his contract. If so delayed, his time for completing his contract should be reasonably extended by the commissioners; they to determine what such reasonable extension should be, and their determination to be final. To all these provisions the plaintiff assented, and they are, in my judgment, a bar to his claim for damages. The third cause of action must be dismissed.

In his statement of the fourth cause of action the plaintiff alleges that, after the work had been commenced, it was discovered by the defendants that, owing to defects in the plans and specifications, "it was impossible and impracticable to build the said sewer, except by substitution of rubblestone masonry laid in cement, in place of concrete, under the side walls of the sewer"; that the defendants so negligently acted that it was not until October 15, 1886, that "a contract was made and entered into between the plaintiff and the defendants modifying the said plans and specifications so as to allow of the substitution of the new foundation for the sewer"; and that by reason of the defendants' said negligence the plaintiff was delayed and put to great expense and damage. By the contract of June 27th the plaintiff engaged to excavate for, build, and complete the sewer in a good, firm, and substantial manner, "in strict conformity in every part and particular" to the plans and specifications which were made a part of the said contract. All bidders for the contract were distinctly informed by the "proposals for estimates" that "no deviation from the specifications will be allowed unless a written permission shall previously have been obtained from the commissioners of the department of public parks." The plans required that the sewer, both invert and side walls, should be built upon a foundation of concrete. By the direction, or at least with the approval, of the engineer in charge, this method of construction was changed, and a foundation of rubblestone masonry was substituted for concrete under the side walls. It does not appear that this substitution was known to, or in any manner authorized by, the park commissioners. The sewer had been so constructed to about 170th street, when, in February, 1886, another engineer was placed in charge, who, after examination, notified the plaintiff that the work must be done according to the original contract plans. On the 13th of April the plaintiff wrote to the commissioners that he understood that Engineer Myers "proposed to change the character of the bottom of the sewer from rubble masonry under the side walls to concrete"; that full examination had been made by Commissioners Beekman and Crimmons, in company with the mayor, and that "the bottom, as opened, was shown to be of such uncertain character" that he had been directed to proceed with the work by piling and rubble side walls; that he was unwilling to proceed upon the verbal instructions of a subordinate who might at any time be displaced, and might repudiate the instructions he had given; and that, "if the character of the work is to be altered, I ask that the matter be settled now, and that I be by your board authoritatively directed how to proceed, that in the end I may not be the sufferer by any legal point or objection that may arise out of these frequent changes, which, I fear, will prove costly and embarrassing in the end." This letter was put before the board at its meeting of April 14th, and was "laid over." On April 19th the plaintiff was notified, in writing, by the engineer, that he must "prosecute the work with greater vigor, and in accordance with the plans and specifications therefor." Collins testifies that the plaintiff paid no attention to this notice. He says that as soon as the new engineer, Myers, came upon the work, he "raised the question of the construction," and that

the plaintiff "did not consider that notice of any effect, since he was waiting on the decision as to what he should do,—the decision of the park board." There is no testimony that I can find that shows that at that time the board had the question under consideration. It does appear that on the 11th of May the commissioners gave the plaintiff this rather peremptory notice: "You are hereby directed to proceed with the construction of the sewer under your contract in conformity with the sections shown on the contract plan of the work for the main sewer, as herein shown." At the foot of the notice was a diagram of a cross section of the sewer, showing a concrete foundation underneath the whole. On the 17th of May the plaintiff was notified by the engineer that any portion of the sewer "built contrary to the plan of the work, after my notice to you dated April 19th, 1886, which notification has been confirmed by the board of park commissioners, must be taken up, and the sewer built according to the plan of the work." Between April 19th and June 4th the plaintiff built 38½ feet of masonry with concrete foundation, according to the contract plan, and then stopped work. He testifies that "Mr. Myers asked me to build it that way to see how it looked, or to see how it would work." Former Commissioner Beekman testifies that there were many conferences between the plaintiff and the board,—the board insisting that the work must be prosecuted in conformity with the plans and specifications,—and that the question arose whether the substitution of rubble for concrete could be made. Thereupon the engineer prepared a plan for continuing the construction, which was, he says, "in effect, using a certain amount of rubble masonry in the place of the old concrete blocks that were called for by the original plan." He recommended its adoption by the board, and on the 29th of May, 1886, the board formally resolved that, in order to hasten the completion of the sewer, an agreement be entered into with the plaintiff to modify the construction according to the plan submitted by the engineer. A contract modifying the original contract in the particular referred to was prepared and submitted to the corporation counsel, who some time prior to June 25th returned the same without his approval; he objecting that the clause in the original contract which was supposed to authorize or permit such modification was not sufficient for that purpose. On the 25th of June the president of the board advised the plaintiff of this decision of the corporation counsel, and said: "We are anxious to be perfectly just and fair to you, but we are bound to consider the interests of the public as paramount, and have no option but to require conformity to your contract obligations. In no sense have we interfered to stop or retard the work, and we must ask that it be continued and pushed to a completion as speedily as possible." On the same day the engineer gave notice to the plaintiff: "You are hereby notified that your work is unnecessarily delayed, and you are required to proceed with the same according to the plans and specifications. It is highly important that this work should be completed as soon as possible." The plaintiff did not proceed. He waited, and did not resume the construction of masonry until about the 16th of October. Meantime a further resolution relating to the proposed modification had been adopted by the commissioners, and a contract prepared by them had been approved, as to form, by the corporation counsel. That contract was executed by the parties hereto on the 15th of October. It provided that "the plan for the construction of said sewer in the further execution of the work be, and the same hereby is, modified by the substitution of rubblestone masonry laid in cement in the place of concrete under the side walls of the sewer," as shown on a plan made by Engineer Myers, and adopted by the board of parks. The sewer was then proceeded with, and was completed according to such modified plan. The claim of the plaintiff is that he was delayed in his work from April 16 to October 16, 1886, a period of 159 days, while awaiting the commissioners' final decision as to the construction of the foundation. He alleges, as already mentioned, that the original plans and specifications were defective, and that it was discovered by the defendants that it was "impossible and impracticable" to build the sewer according thereto, or without the substitution of rubblestone masonry for concrete under the side walls, and that, owing to the defendants' negligence, the contract modifying the plans and specifications so as to permit the rubblestone foundation was not made until the 15th of October. I find no proof that there were de-

fects or imperfections in the plans and specifications, or that it was either im-possible or impracticable to build the side walls on the concrete foundation. The burden was on the plaintiff to make such proof. The defendants made no such discovery as is alleged in the statement of the fourth cause of action. When Engineer Myers took charge of the work in the spring of 1886, the dis-covery made by him was that the plans had been departed from in the con-struction of the sewer, and he forbade any further construction of that sort. It is not denied that such departure was with the consent and approval of the former engineer, but it nowhere appears that such change was necessary, or that the original plans were not capable of precise execution. They certainly were in the judgment of the engineer and of the park commissioners. In May, 1886, by direction of the engineer, the plaintiff built about forty feet ac-cording to the original plan, with concrete under the side walls. There is no proof that the work was attended with difficulty or with extra expense. Very much of the long stoppage from April to October was voluntary on the part of Mr. Jones, and in disregard of orders to go ahead from both the commissioners and the engineer. In his letter to the plaintiff of June 25, 1886 (Exhibit L), Mr. Beekman, president of the board, refers to the question submitted by the plaintiff of substituting rubble masonry for concrete, and says it "was in the nature of an appeal to us to change the requirements of the contract." He also says: "In reference to the change in the foundation asked for by you, the board was quite willing to grant it, the engineer having reported favorably upon it; but, upon forwarding the proper modification to the counsel to the corporation for his approval, we were advised by him that, in his opinion, the clause relied upon as justifying the exercise of this power would not admit of it." This seems to be an exact presentation of the case. The facts are that the plaintiff desired, in constructing the sewer, to deviate from the con-tract plan. The engineer in charge refused to permit him to do so. The plaintiff appealed to the board. The board did not pass on his appeal, but directed him to proceed under his contract. The plaintiff did not proceed. Then the board, "in order to hasten the completion of the sewer," authorized a new contract to be made, modifying the first one in the matter of the foundations of the side walls. The corporation counsel advised that such con-tract could not be made. The board then notified the plaintiff to go ahead and push the work to completion as speedily as possible. The plaintiff paid no attention to that notice. Finally a new contract was entered into, which per-mitted, substantially, the deviation asked for, and then the work was resumed and finished. As I understand the testimony, there is no proof whatever that any part of this long delay was caused by the defendants. No duty rested upon them to modify in any particular any provision of the contract into which the plaintiff had deliberately entered. The plaintiff had no right to demand that they should change the mode of construction of the sewer as distinctly set forth in the original plan. He certainly had no right to refuse to proceed with the work unless the defendants would modify the contract to meet his views, and then charge them with negligence in not yielding prompt-ly to his demands. The fourth alleged cause of action must be dismissed.

For a fifth cause of action the plaintiff alleges as follows: "That while the plaintiff was proceeding, in good faith, to perform the contracts up to that time made by him for the performance of the work mentioned therein, the defendants acted so negligently and carelessly in refusing to allow the plain-tiff to put down piles which were necessary, and so delayed their position as to where piles should be used under the said contracts, that the plaintiff was hindered, impeded, and prevented from proceeding with the full and proper performance of the said work, and was put to great loss, damage, and ex-pense, and incurred cost by reason of the said conduct of the defendants, be-ing delayed upon this account for a period of 459 days, all to his loss and dam-age in the sum of $109,609.50." In his brief the learned counsel for the plain-tiff divides this period of delay into two parts, to wit, from June 8, 1887, to December 28, 1887,—a period, excluding Sundays and holidays, of 169 days; and from January 12, 1888, to December 28, 1888,—a period, excluding Sun-days and holidays, of 294 days. Reference has already been made to the pro-visions of the contract of June 27, 1884, relating to piling, by which the de-fendants reserved to themselves the right to put down a pile foundation, by

contract or otherwise, in case the engineer should decide that at any point the bottom of the trench was "too soft to warrant the building of the sewer on any of the prescribed foundations," and also to the supplemental contract of November 20, 1884, by which the plaintiff agreed to furnish and drive piles whenever it should be decided by the engineer that piles were necessary, and into which were expressly incorporated all the "covenants, agreements, conditions, and provisos" contained in the original contract of June 27th. By both of these contracts the entire question of the necessity for a pile foundation was left to the decision of the engineer. Collins testifies that the delay over piling began January 28, 1887, and that "that question hung until the following December before it was finally settled." This is probably an error. In his letter to Engineer Myers of June 28, 1887, the plaintiff communicated his opinion that pile foundations were necessary between stations 55 and 57 and 50, and said: "Please answer this immediately, as this work is at a standstill for the past ten days, awaiting your decision in this matter." And, as remarked above, counsel, in estimating his claim for damages, fixes the commencement of the delay on the 8th of June. The plaintiff's letter just referred to was promptly answered by the engineer. On June 30th he wrote: "In reply, I refer you to the contract, and would say that the examination of the bottom made in my presence on the 28th inst. would warrant the construction of the sewer on a timber platform, as the plans and specifications call for and as directed. You are required to build the sewer according to the contract and specifications, and are responsible for proper and thorough work." Collins says, substantially, that no attention was paid to this notice, and that no work of consequence was done until December following, when the plaintiff was directed to drive 225 feet of piling. The plaintiff says that he called the attention of the engineer to the necessity for piling "after we got the cut open north of 173d street," that he asked the engineer a great many times for permission to drive piles, and that the engineer refused, insisting that it was not necessary. On October 27th, President Borden, of the park commissioners, notified the plaintiff that the work was "unnecessarily delayed in violation of the provisions of the contract," and that unless before November 10th a force was put upon the work sufficient, in the opinion of the department, to complete it within a reasonable time, the contract would be declared forfeited, and the work be readvertised and relet. Still the plaintiff did nothing. On November 19th Engineer Myers wrote the plaintiff: "You are hereby notified to proceed with the construction of the sewer, &c., under your above-named contract, without delay, and without driving piles. I have examined the bottom of the trench, and find that piles are unnecessary; and this department is not, and will not be, responsible for the cost of piling, when not ordered in accordance with the terms of the contract." This notice was also unheeded by the plaintiff. He testifies that the question of piling was first raised by the property owners. There is nothing in contradiction of this. The proofs show that an expert engineer was employed by the property owners, whose opinion was that piles were necessary, and that an expert engineer was employed by the commissioners, whose opinion was that piles were not necessary, and that at a meeting of the commissioners held on December 22, 1887, a petition was presented, "signed by ninety-five property owners in the vicinity of the Webster avenue sewer," asking that the said sewer be constructed upon a pile foundation, and that, thereupon, at the same meeting, by a vote of the commissioners, "the contractor for the Webster avenue sewer was directed to proceed with the work of piling for a foundation for that sewer, in the trench now open, to the extent of 225 feet." Upon this testimony, can it be said that the plaintiff was hindered by the defendants in the performance of his contract, or that the defendants were guilty of any negligence which furnishes a basis for a claim for damages in favor of the plaintiff? The agreement between the parties was that the defendants' engineer in charge should determine when and where piles were necessary for the foundation for the sewer. The engineer did determine that north of 173d street piling was not necessary. The plaintiff refused to abide by his decision, and refused to go on with his work, although directed to do so by both the engineer and the commissioners. The result, of course, was that his plant was idle, but not through any fault of the defendants. The competency of the engineer is not assailed.

70 N.Y.S.—20

It is not shown that he acted capriciously or negligently or in bad faith. His judgment that piles were not necessary was confirmed by the judgment of an expert selected by the commissioners. It cannot be said, upon the testimony, that the engineer and the expert were mistaken, and that the 225 feet of sewer could not have been substantially and safely built on a timber platform without a pile foundation, in accordance with the specifications and the engineer's letter of June 30th; and I do not agree with the contention of the learned counsel for the plaintiff that the act of the defendants in authorizing the 225 feet of piling was a confession of "the impossibility of building the sewer without piles." It seems to have been a concession to the property owners, whose request was presented to the board on the day the piles were authorized. The balance of the claim which constitutes the fifth cause of action, for delay for 294 days, between January 28 and December 28, 1888, is without proof to support it. After the plaintiff had completed the 225 feet of piling he stopped work, insisting that he could not safely proceed with the construction of the sewer without a pile foundation. On hearing his complaint on the 23d of January, the commissioners, after a long discussion, suspended the work "until further instructions." On March 29th the plaintiff was directed to resume work on the 2d of April. He did not obey, but remained idle for months, and then proceeded with his contract, and completed it without any further piling. His counsel admits that "the plaintiff has been unable to prove that piling was necessary." The results show that it was not necessary. Plaintiff's delay during the year 1888 was not caused by any act or default on the part of the defendants. It follows that the whole of the fifth alleged cause of action must be dismissed.

The first alleged cause of action remains to be further considered. Reference has already been made to the provisions of the original contract, which required the sewer to be completed within 500 working days, and which authorized the defendants, out of any moneys that might become due to the plaintiff, to deduct and retain, as liquidated damages for noncompletion within the time limited, "the sum which shall accrue and become due for the inspectors' wages for each and every day the aggregate time of all the inspectors employed upon said work may exceed the time stipulated for its completion." On August 24, 1887, three years after the commencement of the work, the defendants' engineer certified to the correctness of an account which purported to set forth the details of the work done by the plaintiff and accepted by the defendants in the construction and completion of the first section of the sewer. In that account the plaintiff was charged with $744 for 186 days' overtime, or "excess of inspection," and that item, with others, being deducted from the amount credited to the plaintiff for work and materials, a balance appeared to be due him of $2,775.66. On September 12th the plaintiff was paid this balance by the comptroller, and gave his receipt therefor, "in payment of the above account, which is in full of all claims and demands on this contract, excepting the amount retained as security for repairs," and at the same time an affidavit was made by the plaintiff, in which he stated that "the said account is true and just in each and every particular." About December, 1887, a similar statement of account was certified by the same engineer on the completion and acceptance of section No. 2, in which the plaintiff was charged with 553½ days' overtime. The balance shown to be due ($8,936.75) was paid to him on December 19th; he giving a receipt and making an affidavit in the same terms as before. Early in February, 1889, in a similar statement of work done in constructing and completing section No. 3, the plaintiff was charged with 195¼ days' overtime, amounting to $781. To this he seems to have made objection, and on February 7th appeared before the park commissioners, and, as the minutes of the board show, "was heard relative to the amount to be charged against him for overtime on the third section of the Webster avenue sewer." The board refused to remit the charge, and on March 11th the sum appearing to be due to the plaintiff was paid by the comptroller to the Twelfth Ward Bank, the plaintiff's assignee, which gave the usual receipt; the plaintiff on the same day making the usual affidavit. And in the statement of February 5, 1890, of work done in the construction and completion of section No. 4, the sum of $1,074 was deducted for 268½ days' overtime, making the sum of $8,151.21 due to the plaintiff.

For this sum, which was paid to him on March 14th, he gave the customary receipt, and also executed to the defendants a general release, by which he released them from all claims and causes of action upon or by reason of the contracts hereinbefore mentioned, "excepting $2,603.52 retained as repairing security, and also excepting any legal claim to which I may be entitled under the provisions of the contract." The plaintiff objects that the park commissioners had no authority, under the contract, to determine the amount of overtime. There is no express provision giving them such authority, but the contract declared the rules by which the question of overtime should be determined, and provided that the defendants, who acted by the commissioners, should deduct and retain the "sum which shall accrue and become due for the inspectors' wages," etc., as above quoted. By whom should such excess of time and the amount to be deducted be determined, if not by the commissioners? At all events, when they assumed the right to determine those questions the plaintiff acquiesced, not challenging such right, and received his payments on the basis of their decisions. He further objects that the time limit was waived by the default of the defendants. As I find that the defendants made no default, this objection needs no discussion. It does not appear that the plaintiff disputed his liability for the inspectors' wages charged against him in the statements of August and December, 1897, or that he made any objection to such charges. From the charge in the statement of February, 1889, he appealed to the commissioners. His appeal was disallowed. He made no further protest, but accepted the statement and his money under it. As to these deductions, it seems to me that he is concluded by the facts as to which there is no dispute. The general release he refused to sign until the comptroller consented to insert the exceptions mentioned above. The receipt of March 14th was signed at the same time with the release, and was part of the same transaction. The right to contest the charge for "excess of inspection" contained in the final certificate was reserved to the plaintiff in the release. The plaintiff had completed the work, and presumptively was entitled to be paid for it. It was for the defendants to show why he should not be paid for it. If they asserted the right to deduct any sum for inspectors' wages, it was their duty to show that the right existed. There is no proof that I can find that the deduction of $1,074 in the final certificate for 268½ days' overtime was a just or proper deduction. Indeed, upon all the testimony, it would seem that it was not. The plaintiff is entitled to judgment under his first cause of action for $1,074, with interest from February 5, 1890.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

L. L. Kellogg, for appellant.
C. Mellen, for respondent.

PER CURIAM. Judgment affirmed, with costs, on opinion of referee.

(61 App. Div. 312.)

PEOPLE v. SATCHWELL.

(Supreme Court, Appellate Division, Third Department. May 8, 1901.)

1. CRIMINAL LAW—FORMER CONVICTION—PRIMA FACIE PROOF.
    On a prosecution for selling liquors without a license, a plea of former conviction is prima facie established by a record showing a conviction under an indictment which could be sustained by the evidence necessary to support the second indictment.

2. SAME—EVIDENCE—SUFFICIENCY.
    On a prosecution for selling liquors without a license to B., a plea of former conviction is sustained by the production of a record showing a conviction under an indictment for selling spirituous liquors without license at the same time and place to "Gardiner C. Hibbard, and to other and divers persons" to the grand jury unknown.